**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-00207-002 (CRC)** |
| **v.** | : | |
| | : | |
| **MATTHEW BOKOSKI,** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Matthew Bokoski to 14 days incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

I.     <u>**Introduction**</u>

Defendant Matthew Bokoski participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.[1]   Matthew Bokoski's father and co-defendant, Bradley Bokoski, also participated in the attack on the U.S. Capitol.

---

[1] Although the Statement of Offense in this matter, filed on October 13, 2022 (ECF No. 31 at ¶ 6) reflects a sum of more than $2.7 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Matthew Bokoski pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building.  As explained herein, a short sentence of incarceration is appropriate in this case because he: (1) entered the Capitol through the Senate Parliamentarian Door approximately five minutes after the door was breached and before many other rioters; (2) claimed in consensual interviews with the FBI that a police officer standing near the Senate Parliamentarian Door through which Matthew entered the Capitol invited the rioters into the Capitol, a claim reiterated by his codefendant, Bradley Bokoski, in clear contrast to the evidence indicating no such conversation occurred; (3) boasted to the FBI agents, just a week after January 6, that the rioters were able to "shut down" the United States government; and (4) posted materials to his public Facebook account from January 6, 2021, minimizing or justifying his actions on January 6, 2021.

The Court must also consider that Matthew Bokoski's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts of and circumstances of Bokoski's crime support a sentence of 14 days incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution in this case.

II.   **Factual And Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 33 (Statement of Offense), at 1-7.

*Defendant Matthew Bokoski's Role in the January 6, 2021, Attack on the Capitol*

On January 5, 2021, Matthew Bokoski travelled to Washington, D.C. from Chicago, Illinois, to attend the "Stop the Steal" rally.   Co-defendant Bradley Bokoski traveled to Washington, D.C. from Reno, Nevada, on January 5, 2021, and met Matthew Bokoski in D.C.[2]

On the morning of January 6, Bradley Bokoski and Matthew Bokoski went to the National Mall and attended the rally where they joined a large crowd who, like the Bokoskis, believed that the 2020 election had been stolen.   Bradley Bokoski and Matthew Bokoski were separated during the rally, but the two men reconnected after the former president's speech.   Afterward, the Bokoskis walked with a large crowd along Constitution Avenue towards the U.S. Capitol Building.

Matthew Bokoski and Bradley Bokoski approached the U.S. Capitol from the west.   At 2:36 p.m., the body worn camera of a Metropolitan Police Department Officer who was present near the northwest lawn during the afternoon of January 6, 2021, captured an image of Bradley Bokoski.

Using his mobile telephone, Matthew Bokoski took photos on January 6, 2021, including those that appear to have been taken from inside the restricted area.   Those photos show police barriers and the West Front Inaugural Platform, as well as rioters climbing the scaffolding and the West Terrace walls and approaching the police lines.   *See* Figures 1, 2, and 3.

---

[2] Like Matthew Bokoski, Bradley Bokoski has also pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G).  Bradley Bokoski will be sentenced on the same date as Matthew Bokoski. The government has filed a separate sentencing memorandum in Bradley Bokoski's case.



*Figure 1*



*Figure 2*



*Figure 3*

The Bokoskis were part of a large crowd of rioters on the Northwest Terrace of the U.S.

Capitol.  Matthew Bradley took a photo (Figure 4, below) of the large crowd of rioters gathered

on this Terrace and entering the Senate Parliamentarian Door.  A red arrow has been added to this

4

photo which shows the location of the Senate Parliamentarian Door.  No police officers appear in this photograph by the Senate Parliamentarian Door.



*Figure 4*

Matthew Bokoski also took at least two videos showing the large crowd of rioters on the Northwest Terrace of the U.S. Capitol.  In the first video, Exhibit 1, the crowd is chanting "Stop the Steal."  (Ex. 1, Matthew Video Terrace 1).  In the second video, Bradley Bokoski is shown as the men approach the Senate Parliamentarian Door.  (Ex. 2, Matthew Video Terrace 2, Video at time 0:00 – 0:02).  No police officers appear in those videos near the Senate Parliamentarian Door as the Bokoskis approach the Door.  (Ex. 2, Video at time 00:17 – 00:19).

The Bokoskis entered the U.S. Capitol through the Senate Parliamentarian Door at approximately 2:47 p.m., approximately 6 minutes after the initial breach of the Senate

Parliamentarian Door by other rioters.  United States Capitol Police closed circuit video ("CCV") shows details of the interior of the U.S. Capitol at this location.  (Ex. 3, Ex. 4).

Rioters broke the two glass windows in the Senate Parliamentarian Door, located just outside the Senate Parliamentarian office at approximately 2:42 p.m.  The Senate Parliamentarian Door is a fire exit door, not a public entrance door.  There is no screening equipment for the public at the Senate Parliamentarian Door.  A few seconds after the glass windows were broken, a rioter reached in through the window and pushed the emergency door bar, opening the Senate Parliamentarian Door from the outside.  The first rioters fought with Capitol police at the Senate Parliamentarian Door, but then pushed their way into the corridor.  Large numbers of rioters began entering from the outside through the Senate Parliamentarian Door.  No police were then near the Senate Parliamentarian Door because they had been pushed back into the corridor of the Capitol by the rioters.

Some of the rioters forced open the interior door to the office of the Senate Parliamentarian.  Then, a rioter attempted to ram open another door across the corridor from the Senate Parliamentarian's office, using a Capitol sign.  Additional rioters pounded on that door over the next ninety seconds, first using the Capitol sign, then multiple rioters pushing against the door, eventually breaching that office door.  Rioters continued to stream in through the Senate Parliamentarian Door.  Over the next minute, at least three rioters were at the Senate Parliamentarian Door, waving people in from outside and encouraging their entry into the Capitol.

According to Capitol police video, Bradley Bokoski was yelling as he entered the Capitol at the Senate Parliamentarian Door.  (Ex. 3, CCV at video time 00:04).  After crossing into the Capitol, Bradley Bokoski and Matthew Bokoski were holding cell phones and appeared to be recording video or taking photographs of their entry into the Capitol Building.  (Ex. 3, CCV at

video time 00:10 – 00:15; Ex. 4, CCV at video time 00:01 – 00:05).  As shown in Figures 5 and 6, below, Bradley Bokoski (circled in white) is accompanied by Matthew Bokoski (circled in red) when they entered the Capitol.  Matthew Bokoski was wearing a blue and red knit cap with a pom-pom on top, and red and blue "TRUMP 2020" flag on his back.  Bradley Bokoski is wearing a gray jacket and eyeglasses and has a white mustache and beard.


*Figure 5*


*Figure 6*

When he entered the U.S. Capitol, Bradley Bokoski appeared to have a short conversation with a rioter in a black jacket, camouflage pants and a backpack near the Senate Parliamentarian Door.  (Ex. 3, CCV at video time 00:11 – 00:14; Ex. 4, CCV at video time 00:00 – 00:02).  The rioter with the black jacket, camouflage pants and a backpack came from the office door across from the Senate Parliamentarian office door and moved to the Senate Parliamentarian Door.  (Ex. 3, CCV at video time 00:01 – 00:09).

The Bokoskis did not enter the Senate Parliamentarian's office but continued a short distance down the corridor.  Matthew Bokoski continued to film the corridor scene on his phone.  (Ex. 3, CCV starting at video time 00:19; Ex. 4, CCV at video time 00:02 – 00:12).

Matthew Bokoski posted a video he took in the Capitol to his Facebook account at 4:40 p.m. on January 6.  (Exhibit 5).  In this video, Bradley Bokoski is shown as the men stand in the

corridor and the rioters are chanting "USA" over and over.  (Ex. 5, Corridor Video at video time 00:53 – 00:56).  An alarm is clearly heard during the entirety of this video.  Further, audio captures a rioter in the proximity of the Bokoskis yelling threats against Speaker Nancy Pelosi, including "We're coming for you Nancy.  We're coming for you . . . "  (Ex. 5, Corridor Video at video time 00:12 – 0:21).  A single officer stands guard on the staircase, in the middle of the chaos in the corridor.  (Ex. 5, Corridor Video at video time 0:32 – 0:34).  The following image, Figure 7, was taken within the U.S. Capitol building, and was saved from that video:



*Figure 7*

Bradley Bokoski and Matthew Bokoski moved with the crowd down the corridor where they met a police line of approximately ten to fifteen officers.  Back near the Senate Parliamentarian Door, additional police officers entered the corridor from the office across the corridor from the Senate Parliamentarian's office.  The police officers began to move the rioters towards the Senate Parliamentarian Door and out of the Capitol.

Bradley Bokoski and Matthew Bokoski turned around and walked back towards the Senate Parliamentarian Door.  They walked past the police officers in the corridor.  Bradley Bokoski

appeared to have a brief conversation with the police officers in the corridor.  One of the officers shook his head in a "no" gesture, then Bradley Bokoski and Matthew Bokoski exited the Senate Parliamentarian Door.  The Bokoskis exited the Senate Parliamentarian Door at approximately 2:52 p.m., and they were in the Capitol building for approximately 4-5 minutes.

*Matthew Bokoski's interview with FBI Agents*

On January 14, 2021, FBI agents interviewed Matthew Bokoski in person in Chicago, Illinois. Matthew Bokoski admitted that on January 6, 2021, he and his father walked around the U.S. Capitol grounds and entered the U.S. Capitol Building.

He further stated that he took photos and video during his January 6, 2021 entry and presence in the U.S. Capitol Building, and he posted photos and comments to his Facebook account on January 6, 2021.  Matthew Bokoski told the officers that he posted the pictures and comments to show the world that the rally was not all violent.  Matthew Bokoski told the agents that the rally was more effective than the riots that occurred earlier in Chicago, because in twenty minutes the "Trump supporters" were able to "shut down the government."  He provided a number of his photographs from January 6, 2021, to agents.

Matthew Bokoski told officers that as he followed the crowd through the southwest entrance of the Capitol, a D.C. Metropolitan police officer, described as holding a baton but not wearing any riot gear like other officers, stood at the entrance and stated, "Welcome to the people's house, just don't touch anything."  However, the Capital video and photo provided by Matthew Bokoski to the agents do not show any police at the Senate Parliamentarian Door when Matthew Bokoski and Bradley Bokoski entered the U.S. Capitol.

*Matthew Bokoski's Post Arrest Interview*

Matthew Bokoski was arrested on a federal warrant on May 25, 2022 and gave a voluntary post-arrest interview to FBI agents.  In this custodial interview, the agents asked Matthew Bokoski about his statement in his January 2021 interview, where he said a police officer greeted him and Bradley Bokoski when they entered the U.S. Capitol.  Matthew Bokoski said when they got to the Capitol, Bradley Bokoski was questioning whether to go further, but Matthew Bokoski encouraged him to go ahead if they were not harming anything.  Matthew Bokoski told the agents that no one ever told him and his father to leave or that he did not belong there, so Matthew Bokoski felt it was okay to be in the Capitol.  Matthew Bokoski said he saw police officers in riot gear were standing outside the Capitol and these officers allowed them to walk up the steps to the Capitol. Inside the Senate Parliamentarian Door, Matthew Bokoski said the officer was 2 – 3 feet inside the door standing when he and Bradley Bokoski entered the Capitol, on the left-hand side of the door.  Matthew Bokoski told agents this officer said, "Welcome to the People's House.  You know, please don't harm us and we won't harm you, we'd rather not have to make this a show of force." Matthew said he saw other officers in the hallway in riot gear.

The officers asked Matthew Bokoski if he saw any windows broken on the door as he entered the U.S. Capitol.  Matthew Bokoski admitted the window on the door was broken when they went into the Capitol.  While Matthew Bokoski said he did not witness someone breaking the window, he assumed someone punched the window, reached through it and just opened it.

The officers asked Matthew Bokoski if he heard any alarms when he was in the Capitol. Matthew Bokoski if there were alarms, they were inaudible to him.

10

*Social Media Posts by Matthew Bokoski*

In communicating with others on Facebook, Matthew Bokoski spread false information that the attack was "pretty peaceful" stating that people were "expressing their rights as they see fit…" On January 6, at 5:47 p.m., he posted a public comment that read in part "I was with my dad and walked right up the Capitol steps and inside with others."

On January 6, 2021, at 5:23 p.m. EDT,[3] Matthew Bokoski commented on Facebook:

it could've been worse man. I was out here peacefully and so where thousands and thousands of others of people expressing their rights as they see fit while you sat at home on your ass. . . A security guard getting trigger happy is on him, a few people fuxking with the media was not the millions that were there. . . The media is blowing it up bigger than you see. I can say first hand overall it was pretty peaceful cause well unlike you I was actually there to witness it all firsthand. At the end of the day a city wasn't looted and burnt to the ground the way democrats do things so please tell me how bad it was from your tv

Matthew Bokoski claimed law enforcement condoned his entry to the U.S. Capitol, posting on January 6 at 8:01 p.m. in a reply he posted to another person's comment:

. . .You act as if I assaulted the police, or defaced property or harassed people. The worst I'd be guilty of is trespassing after the fact but I also was not stopped from being their. I walked past 2 dozen police officers who allowed people to be outside and pass right by when I was able to get that close. So even then since I was not told to leave by official law enforcement and they allowed me past I can't really be found guilty when no one said no you can't be here".

On January 7, 2021, at 12:48 p.m., Matthew Bokoski responded to another person with the comment "My dad called em and said to remove anything with the inside of the capital because they were offing rewards to people who would help find anyone that was inside event for a second." He changed the privacy settings to restrict access on some of his Facebook posts.

---

[3] Times converted from UTC times.

*The Charges and Plea Agreement*

On May 16, 2022, the United States charged Bradley Bokoski and Matthew Bokoski by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1), (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D), (e)(2)(G).  On May 25, 2022, law enforcement officers arrested Matthew Bokoski in Chicago, Illinois.  On June 6, 2022, the United States charged Matthew Bokoski and Bradley Bokoski with the same four offenses. On October 13, 2022, pursuant to a plea agreement, Matthew Bokoski pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building.  By plea agreement, Matthew Bokoski agreed to pay $500 in restitution to the Department of the Treasury.

## III.    **Statutory Penalties**

Matthew Bokoski now faces a sentencing on a single count of violating 40 U.S.C. § 5104 (e)(2)(G).  As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.    **Sentencing Factors Under 18 U.S.C. § 3553(A)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as

described below, the Section 3553(a) factors weigh in favor of 14 days incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir.). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Bokoski's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Bokoski, the absence of violent or destructive acts is not a mitigating factor. Had Bokoski engaged in such conduct, he or she would have faced additional criminal charges.

One of the most important factors in Matthew Bokoski's case is that he made statements to FBI agents that are not credible in light of the video evidence.  He told agents that a police officer "welcomed" him and his father into the Capitol.  However, the Capitol video of the Senate Parliamentarian Door (Ex. 4, Ex. 5) does not show any police officer at the door when the Bokoskis entered the Capitol.  He also justified his entry into the Capitol because no officer affirmatively told him not to enter the Capitol, despite the presence of audible alarms and broken glass.  He described the riot as "peaceful" through his public posts on Facebook and boasted he and other rioters had "shut down" the United States government.  Further, he entered the Capitol Building through the Senate Parliamentarian Door approximately five minutes after this door was breached by rioters, and before many others.  This was a fire exit door, not a public entryway.  Other rioters broke the windows and forced the door open, which set off loud alarms and left broken glass in

the corridor.  Matthew Bokoski saw and continued towards the Capitol despite the chaos created by the mob, from people scaling the scaffolding and terrace walls, and the swell of rioters in the Northwest Terrace.  When contacted by FBI agents, Matthew Bokoski cooperated and provided some of his photographs to the agents, but minimized his conduct on two occasions in his statements to law enforcement.

In his interview with the Probation Office, Matthew Bokoski stated he was sorry for his actions and his participation in the office, but emphasized he is a "regular, hard-working person trying to lead a good life and was in the wrong place at the wrong time."

Accordingly, the nature and the circumstances of this offense establish the need for a short sentence of incarceration in this matter.

### B.  The History and Characteristics of Bokoski

As set forth in the draft PSR, Matthew Bokoski has no criminal history.  According to the draft PSR, he tested positive for marijuana on July 11, 2022.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

**D.  The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

*Specific Deterrence*

Matthew Bokoski made statements to FBI agents on two occasions that are contrary to video evidence and attempted to justify his actions on January 6.  In his statements to agents, Matthew Bokoski stated that law enforcement welcomed his entry into the Capitol.  While the Senate Parliamentarian door was open when the Bokoskis walked through it, it was noticeable that the windows to the door had been broken in, that the door was not a public entrance but a fire exit door, that the alarms were going off and that the officers at the end of the hall were preventing their further progress deeper into the Capitol.  Matthew Bokoski's statement that a law enforcement officer said, "Welcome to the People's House.  You know, please don't harm us and

we won't harm you, we'd rather not have to make this a show of force" is contrary to the Capitol police video evidence in this case.  The riot was not "peaceful" as demonstrated by the video from Capitol police and his own video of the date.  Finally, Matthew Bokoski's social media posts on and after January 6, 2021, showed that he was proud that he and the other rioters "shut down" the Congress.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This Court must sentence Matthew Bokoski based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a).  Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted.  *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

---

[4] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a)

factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71

(ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, this court has sentenced Capitol breach defendants who had similar factors to Matthew Bokoski.

In *United States v. Robert Bauer*, 21-cr-49, the defendant pled to the misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating or picketing inside the Capitol) in connection with his actions on January 6. Although that defendant admonished other rioters not to assault law enforcement officers, he treated the chaos and disorder around him as an entertaining spectacle, even posing for a selfie-style photograph in a mob of people inside the Capitol with his middle finger raised. The defendant was inside the Capitol for a brief period of time – approximately 17 minutes – yet made his way into the Crypt, where police officers were being attacked. The defendant admitted to his actions only two days after the riot and accepted responsibility early through a plea agreement, but had not expressed true remorse for his actions, stating to the FBI, "I don't feel like I done nothing terribly wrong." The defendant did have a serious criminal history. Judge Chutkin sentenced the defendant to 45 days' incarceration, 60 hours community service and $500 restitution. Like this defendant, Matthew Bokoski told the probation office that he "was in the wrong place at the wrong time," but right after January 6, he told agents that he and other rioters "shut down" the government, which means he was not in the Capitol by mistake, but because he wanted to take action against Congress.

Several other defendants have received sentences of probation and fines for their brief entry into the Capitol from this Court.  In *United States v. Julia Sizer*, 21-cr-621 (CRC), the defendant pled guilty to the misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G) in connection with being inside the Capitol for only 2 minutes; but defendant first lied to law enforcement about going in, then corrected that lie; the defendant had no social media statements or criminal history; but intended to stop certification.  This court sentenced the defendant to 12 months' probation, a $2,000 fine, and $500 restitution.  Similarly, in *United States v. John Wilkerson IV*, 21-cr-302 (CRC), the defendant pled guilty to a misdemeanor charge of 40 U.S.C. § 5104(e)(2)(D) (disorderly conduct in the Capitol building) in connection with remaining in the Capitol building for 20-25 minutes and making minor post 1/6 statements indicating a lack of remorse.  This Court sentenced the defendant to 36 months' probation, a $2,500 fine, 60 community service and $500 restitution.  Unlike these defendants, Matthew Bokoski made repeated statements to agents that a police officer welcomed him into the Capitol, contrary to video evidence.

In *United States v. Jacob Lewis*, 21-cr-1000, the defendant pled guilty to 40 U.S.C. § 5104(e)(2)(G) in connection with his planned trip to Washington, D.C. and the Capitol, and he entered knowing the Capitol building had been breached.  In his interview, he expressed no remorse for his actions and lied to law enforcement about being "escorted in" to the Capitol.  The defendant was inside the Capitol for about 7 minutes, and he did not engage or encourage violence or property destruction.  This court sentenced the defendant to 24 months' probation, a $3,000 fine, $500 restitution, and 60 hours community service.  Unlike this defendant, Matthew Bokoski made public postings on Facebook claiming the riot was "peaceful."

Here, Matthew Bokoski entered the Capitol with obvious evidence that entering the Capitol was illegal – he passed through the West Terrace having seen people climbing a scaffolding and

terrace walls, he entered the Senate Parliamentarian door only five minutes after the door was breached, the windows to the Senate Parliamentarian Door were broken and the fire exit alarm was sounding loudly in the corridor, and even though he stayed in the corridor a few minutes, he stayed after another rioter was yelling threats against Speaker Pelosi.  While he ultimately accepted responsibility for his actions, plead early and provided information and photographs and videos he took on January 6, during his initial interview with law enforcement, Matthew Bokoski made statements to FBI agents that are contrary to the video evidence in this case.  He tried to justify his entry as an action condoned by law enforcement.  The video evidence from Capitol police and Matthew Bokoski directly contradicts his statement to law enforcement that a Capitol police officer told him "Welcome to the People's House.  You know, please don't harm us and we won't harm you, we'd rather not have to make this a show of force."  Further, Matthew Bokoski's public Facebook posts on and after January 6 demonstrate that he did not accept that his actions at the Capitol were illegal, and that the rioters at the Capitol were not peaceful.  Finally, he continued to voice support for disrupting Congress and the certification of the election, stating the rioters were able to "shut down the government".

## V.   A Sentence Of Probation May Include Imprisonment As A Condition Of Probation.

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983

WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*[5]

Section 3563(b)(10) authorizes a sentencing court to impose one or more intervals of imprisonment as a condition of probation.  18 U.S.C. § 3653(b)(10).  Section 3563(b)(10) authorizes sentencing courts to impose up to a year (or the authorized statutory maximum) of imprisonment, which the defendant must serve during the first year of probation.  *Id.*  Thus, for a violation of 40 U.S.C. § 5104(e)(2)(G), Section 3563(b)(10) facially permits a sentencing court to require the defendant to serve up to six months in prison as a condition of probation.  *See* 40 U.S.C. § 5109; 18 U.S.C. § 3563(b)(10).  Any imprisonment term imposed as a condition of probation must be served during "nights, weekends or other intervals of time." § 3563(b)(10).

Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059-01-RDR, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (continuous 60-day incarceration not appropriate as a condition of probation); *United States v. Forbes*, 172 F.3d 675,

---

[5] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

676 (9th Cir. 1999) ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).

Typically known as "intermittent confinement," a sentencing court may impose multiple intervals of imprisonment under Section 3563(b)(10).  *See Anderson*, 787 F. Supp. at 539.  Section 3563(b)(10) thus authorizes this Court to impose more than one imprisonment interval, where each such interval is no more than 14 days.  *See, e.g.*, *United States v. Cameron*, 22-cr-17 (TFH), ECF No. 36 (D.D.C. Aug. 17, 2022) (imposing 30-day imprisonment sentence (ten three-day intervals) and three years of probation); *United States v. Vuksanaj*, 21-cr-620 (BAH), ECF No. 43 (D.D.C. Apr. 29, 2022) (imposing 42-day imprisonment sentence (three 14-day intervals) and three years of probation); *United States v. Reed*, 21-cr-204 (BAH), ECF No. 177 (D.D.C. Apr. 14, 2022) (same); *United States v. McCreary*, 21-cr-125 (BAH), ECF No. 46 (D.D.C. Apr. 1, 2022) (same); *United States v. Howell*, 21-cr-217 (TFH), ECF No. 41 (D.D.C. Mar. 8, 2022) (imposing 60-day imprisonment sentence (six 10-day intervals) and three years of probation); *United States v. Schornak*, 21-cr-278 (BAH), ECF No. 71 (D.D.C. Feb. 18, 2022) (imposing 28-day imprisonment sentence (two 14-day intervals) and three years of probation).  Imposing a sentence with fourteen (14) days of imprisonment as a condition of probation is appropriate in this case.

To be sure, earlier in the investigation of the January 6 attack on the Capitol, the government refrained from recommending intermittent confinement sentences given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic.  At this point, however, multiple jury trials have successfully occurred, *see* Standing Order No. 22-64 (BAH), at 3 (D.D.C. Nov. 9, 2022) (noting that the Court has "forg[ed] ahead" and eas[ed] the backlog" of criminal cases since the

Omicron surge began to abate in February 2022), and general COVID trends appear to show a decrease in cases.[6]

## VI.   A Sentence Imposed For A Petty Offense May Include Both Imprisonment And Probation.

The government's recommended sentence 14 days imprisonment and 36 months or probation is also permissible under 18 U.S.C. § 3561(a)(3).  As Judge Lamberth observed, Section 3561(a)(3) "permits a sentencing judge to impose a term of probation at the same time as a term of imprisonment when a defendant is sentenced to imprisonment for only a petty offense or offenses."  *Little*, 590 F.Supp.3d at 351; *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022).  Because the government has briefed a sentencing court's authority to impose a split sentence for a defendant convicted of a single petty offense in this Court and the D.C. Circuit, those arguments are not elaborated further here.[7]

## VII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant Matthew Bokoski to 14 days incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

---

[6] *See* Centers for Disease Control and Prevention, COVID Data Tracker, *available at* https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last viewed Nov. 21, 2022).

[7] The defendant's appeal of the split sentence imposed in *Little* is pending.  The D.C. Circuit heard oral argument on November 2, 2022.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    <u>s/ Lynnett M. Wagner</u>
Assistant United States Attorney
Nebraska Bar No. 21606
Assistant United States Attorney
United States Attorney's Office
District of Columbia
601 D Street NW
Washington, DC 20530
402-661-3700
lynnett.m.wagner@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

On this 10th day of January 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

<u>/s/Lynnett M. Wagner</u>
LYNNETT M. WAGNER
Assistant United States Attorney